

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 18 2010

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

WRIGHT MEDICAL GROUP, INC. D/B/A
WRIGHT MEDICAL TECHNOLOGY, INC.
AND SURGICAL TECHNOLOGIES, LLC

**PLAINTIFFS**

VS.

CASE NO. 3:10CV0033JLH

KEVIN DARR, CHARLES HALL, AND
MARK STARRING & ASSOCIATES, INC.

**DEFENDANTS**

This case assigned to District Judge _HOLMES_
COMPLAINT and to Magistrate Judge_____ DEERE

Plaintiffs, Wright Medical Group, Inc. d/b/a Wright Medical Technology, Inc. and

Surgical Technologies, LLC, respectfully come before this Court, by and through their respective

attorneys, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC for Wright Medical Group,

Inc. d/b/a Wright Medical Technology, Inc., and Bowen Law Firm, PLLC for Surgical

Technologies, LLC, and for their Complaint against Defendants, Kevin Darr, Charles Hall, and

Mark Starring & Associates, Inc., allege as follows:

## STATEMENT OF JURISDICTION AND VENUE

1. Plaintiff Wright Medical Group, Inc. operates through its wholly owned

subsidiary Wright Medical Technology, Inc. ("Wright"), which is a Delaware corporation, and

has its principal place of business in Arlington, Tennessee.

2. Plaintiff Surgical Technologies, LLC ("Surgical Technologies") is a limited

liability company formed under the laws of the State of Tennessee. Paul Massa is the sole

member of Surgical Technologies, and he is a resident and citizen of the State of Tennessee.

3. Defendant Kevin Darr is a resident and citizen of the State of Arkansas.

4. Defendant Charles Hall is a resident and citizen of the State of Arkansas.

5.      Defendant Mark Starring & Associates, Inc. ("Mark Starring") is a Louisiana corporation, and has its principal place of business in Metairie, Louisiana.

6.      This is an action for declaratory judgment, injunctive relief, and money damages arising out of breaches of non-compete agreements made by Kevin Darr and Charles Hall in the State of Arkansas, violations of the Arkansas Trade Secrets Act committed by Defendants in the State of Arkansas, interference with contractual relations committed by Defendants in the State of Arkansas, and breaches of the duty of loyalty committed by Mr. Darr and Mr. Hall in the State of Arkansas.

7.      There is complete diversity of citizenship between Plaintiffs and Defendants, and the amount in controversy for each Plaintiff exceeds $75,000.00, exclusive of interest and costs.

8.      This Court has diversity-of-citizenship jurisdiction pursuant to 28 U.S.C. § 1332, and venue pursuant to 28 U.S.C. § 1391.

STATEMENT OF CLAIMS

FACTS COMMON TO ALL CLAIMS

9.      Wright is a global orthopedic medical device company specializing in the design, manufacture, and marketing of reconstructive joint devices and biologics.

10.     Wright operates most of its business through independent distributors who establish non-compete covenants with their independent and employed sales representatives.

11.     Wright also establishes covenants not to compete with distributors and sales representatives by granting stocks that contain restrictions against competition.

12.     Surgical Technologies is an independent distributor of medical devices, and has sold Wright's products in Arkansas for over twenty years. Through cooperation and hard work,

2

Wright and Surgical Technologies have developed strong business relationships and excellent goodwill with clients throughout Arkansas.

13.     In February of 2001, Surgical Technologies hired Kevin Darr to sell Wright's products in northeast Arkansas.

14.     As a benefit of his employment with Surgical Technologies, Mr. Darr was able to participate in Wright's stock option program. Mr. Darr accepted with stock options in 2002, 2003, 2004, 2005, and 2006. He also accepted restricted stock in 2007 and 2008.

15.     Conditioned upon issuance of those options and restricted stock, Mr. Darr entered into an agreement with Wright that prohibited him from competing in any manner against Wright in any of the geographical territories where he was a sales representative for Wright. In pertinent part, the stock option agreements for 2002 through 2006 and the restrictive stock agreements for 2007 and 2008 provide the following:

> STOCK OPTION AGREEMENTS
>
> By accepting the Options, the Participant represents and agrees for himself and his transferees (whether by will or the laws of descent and distribution) that:
>
> For the period commencing on the date of this Agreement and ending on the first one year anniversary of the termination of Participant's service (such period is hereinafter referred to as the "Restricted Period"), with respect to any geographic territories in which the Company is engaged in business during the period for which the Participant is engaged to provide Service and, for the one year following such period of Service, with respect to the territory of the Participant's Service (such periods are hereinafter referred to as the "Restricted Period"), the Participant shall not participate or engage, directly or indirectly, for himself or herself or on behalf of or in conjunction with any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder, partner, joint venturer, investor or otherwise (other than a limited partner or stockholder of less than one percent of the issued and outstanding limited partnership interests or stock of a publicly held partnership or corporation whose gross assets exceed $1,000,000) in the distribution, solicitation, promotion, manufacture, design, development, or sale of any medical products

3

or services competitive with products manufactured, marketed, or sold by the Company or any of its subsidiaries or any medical products or services intended to be manufactured, marketed, or sold by the Company of the same general type or function. The parties intend the restrictions in this Paragraph 7 to be completely severable and independent, and any invalidity or unenforceability of any one or more of such restrictions shall not render invalid or unenforceable any one or more restrictions.

(A copy of the stock option agreements is attached hereto as Exhibit A).

RESTRICTED STOCK AGREEMENT

By accepting the Shares, Grantee represents and agrees for Grantee and Grantee's transferees (whether by will or the laws of descent and distribution) that:

For the period commencing on the Grant Date and ending on the first anniversary of the termination of Grantee's service (such period is hereinafter referred to as the " Covenant Period"), with respect to any geographic territories which the Company is engaged in business during the period for which Grantee provided service to the Company, Grantee shall not participate or engage, directly or indirectly, for Grantee or on behalf of or in conjunction with any person, partnership, corporation or other entity, whether as a employee, agent, officer, director, stockholder, partner, joint venturer, investor or otherwise, (other than a limited partner or stockholder of less than one percent of the issued and outstanding limited partnership interests or stock of a publicly held partnership or corporation whose gross assets exceed $1,000,000) in the distribution, solicitation, promotion, manufacture, design, development, or sale of any medical products or services competitive with products manufactured, marketed, or sold by the Company or any of its subsidiaries or any medical products or services intended to be manufactured, marketed, or sold by the Company of the same general type or function.

(A copy of the restricted stock agreements is attached hereto as Exhibit B).

16.     Mr. Darr performed well in his position, and developed close business relationships with the clients of Wright and Surgical Technologies.

17.     Several years later, in 2006, Surgical Technologies hired Charles Hall to assist Mr. Darr in selling Wright's products in northeast Arkansas.

M JCH01 2040243 v5
2789037-000027

18.     Because Mr. Hall was to be given the client contacts and confidential pricing information of Wright and Surgical Technologies in order to perform his job, he was required to sign a non-compete agreement with Surgical Technologies as a condition of his employment. A copy of that agreement is attached as "Exhibit C".

19.     Under the terms of that agreement, Mr. Hall agreed to not compete against Wright or Surgical Technologies in specified counties in northeast Arkansas, including Craighead County, for one year after leaving his employment with Surgical Technologies.

20.     Like Mr. Darr, Mr. Hall performed well in his position, and developed close business relationships with the clients of Wright and Surgical Technologies.

21.     In early December of 2009, Mr. Darr and Mr. Hall informed Surgical Technologies that they would be leaving at the end of the year and going to work for Mark Starring in northeast Arkansas.

22.     Mark Starring sells reconstructive joint devices and biologics for another manufacturer in direct competition with Wright and Surgical Technologies in northeast Arkansas, including Craighead County.

23.     In January of 2010, Surgical Technologies learned that Mr. Darr and Mr. Hall had not only gone to work for Mark Starring, but were reconstructive joint devices and biologics for Mark Starring to clients of Wright and Surgical Technologies in Craighead County.

24.     Mr. Darr and Mr. Hall continue to sell reconstructive joint devices and biologics for Mark Starring to clients of Wright and Surgical Technologies in Craighead County.

25.     Upon information and belief, Mr. Darr and Mr. Hall have disclosed trade secrets of Wright and Surgical Technologies to Mark Starring, and Mark Starring has used those trade secrets in order to sell reconstructive joint devices and biologics to their customers.

M JCH01 2040243 v5
2789037-000027

26.     Mr. Darr and Mr. Hall started selling competitive products for Mark Starring to clients of Wright and Surgical Technologies while still working for Surgical Technologies.

27.     Armed with intimate knowledge of Plaintiffs' trade secrets information, including complete knowledge of their research and development, pricing, cost and profit factors, sales tactics, marketing plans and methods, customers, contracts, and personnel, Mr. Darr and Mr. Hall have joined forces with Mark Starring to compete directly against Wright and Surgical Technologies in the sale of reconstructive joint devices and biologics.

28.     Based on information and reasonable belief, while working for Mark Starring and during the effective period of the covenants not to compete, Mr. Darr and Mr. Hall have competed directly against Wright and Surgical Technologies by soliciting their customers to buy Mark Starring's products.   The solicitations included, without limitation, enticing customers whose names became known to Mr. Darr and Mr. Hall during their employment with Surgical Technologies to terminate their existing relationships with Wright and Surgical Technologies and to start new relationships with Mark Starring.

29.     Based on information and reasonable belief, Mr. Darr and Mr. Hall have attended, and continue to attend, surgeries on behalf of Mark Starring for surgeons who have changed their business from Wright and Surgical Technologies to Mark Starring.

30.     The above described actions have caused damage to the goodwill, trade secrets, confidential information, and future business of Wright and Surgical Technologies, and they will continue to suffer irreparable damage in an amount to be determined at trial.

M JCH01 2040243 v5
2789037-000027

## COUNT ONE - ENFORCEMENT OF NON-COMPETE AGREEMENT
## BY WRIGHT AGAINST KEVIN DARR

31.    By selling competitive products for Mark Starring to clients of Wright and Surgical Technologies in Craighead County within one year after leaving the employment of Surgical Technologies, Mr. Darr has violated, and continues to violate, the terms of his non-compete agreement with Wright.

32.    In violating his non-compete agreement with Wright, Mr. Darr has damaged, and continues to damage, the goodwill, trade secrets, confidential information, and future business of Wright in northeast Arkansas, including Craighead County.

33.    Wright suffers a threat of irreperable harm to its goodwill, trade secrets, confidential information, and future business in northeast Arkansas, including Craighead County, if Mr. Darr is not enjoined from violating his non-compete agreement.

34.    In order to protect against future damage to its goodwill, trade secrets, confidential information, and future business in northeast Arkansas, including Craighead County, Mr. Darr should be enjoined from competing against Wright in northeast Arkansas, including Craighead County, until the end of 2010.

## COUNT TWO - ENFORCEMENT OF NON-COMPETE AGREEMENT
## BY SURGICAL TECHNOLOGIES AGAINST CHARLES HALL

35.    By assisting Mr. Darr in selling competitive products for Mark Starring to clients of Wright and Surgical Technologies in Craighead County within one year after leaving the employment of Surgical Technologies, Mr. Hall has violated, and continues to violate, the terms of his non-compete agreement with Surgical Technologies.

7

36.     In violating his non-compete agreement with Surgical Technologies, Mr. Hall has damaged, and continues to damage, the goodwill, trade secrets, confidential information, and future business of Surgical Technologies in northeast Arkansas, including Craighead County.

37.     Surgical Technologies suffers a threat of irreperable harm to its goodwill, trade secrets, confidential information, and future business in northeast Arkansas, including Craighead County, if Mr. Hall is not enjoined from violating his non-compete agreement.

38.     In order to protect against future damage to its goodwill, trade secrets, confidential information, and future business in northeast Arkansas, including Craighead County, Mr. Hall should be enjoined from competing against Surgical Technologies in northeast Arkansas, including Craighead County, until the end of 2010.

## COUNT THREE - VIOLATION OF ARKANSAS TRADE SECRETS ACT
## BY PLAINTIFFS AGAINST DEFENDANTS

39.     The client contacts and confidential pricing information of Wright and Surgical Technologies constitute "trade secrets" under the Arkansas Trade Secrets Act.

40.     By sharing the client contacts and confidential pricing information of Wright and Surgical Technologies with Mark Starring, Mr. Darr and Mr. Hall has violated the Arkansas Trade Secrets Act.

41.     By using those client contacts and that confidential pricing information to compete against Wright and Surgical Technologies, Defendants have violated the Arkansas Trade Secrets Act.

42.     Plaintiffs suffer a threat of irreparable harm to their goodwill, trade secrets, confidential information, and future business in northeast Arkansas, including Craighead County, if Defendants are not enjoined from violating the Arkansas Trade Secrets Act.

8

43.     In order to protect against future damage to their goodwill, trade secrets, confidential information, and future business in northeast Arkansas, including Craighead County, Defendants should be enjoined from competing against Wright and Surgical Technologies in northeast Arkansas, including Craighead County, until the end of 2010.

44.     Wright and Surgical Technologies have suffered substantial damages as a direct and proximate result of Defendants' violations of the Arkansas Trade Secrets Act.

45.     Defendants' violations of the Arkansas Trade Secrets Act were intentional and committed with malice toward Wright and Surgical Technologies, warranting the imposition of punitive damages.

## COUNT FOUR - INTERFERENCE WITH CONTRACTUAL RELATIONS BY PLAINTIFFS AGAINST DEFENDANTS

46.     Prior to the wrongful acts committed by Defendants, Wright and Surgical Technologies had a legitimate business expectancy in continuing to do business with its clients in Craighead County and throughout northeast Arkansas.

47.     By competing against Wright and Surgical Technologies in violation of their non-compete agreements, Mr. Darr and Mr. Hall have wrongfully interfered with Plaintiffs' legitimate business expectancy in continuing to do business with its clients in Craighead County and throughout northeast Arkansas.

48.     By exploiting the client contacts and confidential pricing information that Mr. Darr and Mr. Hall provided in violation of their non-compete agreements, Mark Starring has wrongfully interfered with Plaintiffs' legitimate business expectancy in continuing to do business with its clients in Craighead County and throughout northeast Arkansas.

M JCH01 2040243 v5
2789037-000027

49.    Wright and Surgical Technologies have suffered substantial damages as a direct and proximate result of Defendants' wrongful interference with their legitimate business expectancies in Craighead County and throughout northeast Arkansas.

50.    Defendants' wrongful interference with Plaintiffs' legitimate business expectancies was intentional and committed with malice toward Wright and Surgical Technologies, warranting the imposition of punitive damages.

## COUNT FIVE - BREACH OF DUTY OF LOYALTY BY SURGICAL TECHNOLOGIES AGAINST KEVIN DARR AND CHARLES HALL

51.    By selling competitive products for Mark Starring to clients of Wright and Surgical Technologies prior to leaving the employment of Surgical Technologies, Mr. Darr and Mr. Hall violated their duty of loyalty to Surgical Technologies.

52.    Surgical Technologies has suffered substantial damages as a direct and proximate result of the breaches of the duty loyalty committed by Mr. Darr and Mr. Hall.

53.    The breaches of the duty loyalty committed by Mr. Darr and Mr. Hall were intentional and committed with malice toward Surgical Technologies, warranting the imposition of punitive damages.

## JURY DEMAND

54.    Plaintiffs demand a jury trial with respect to all issues of fact that may arise herein.

WHEREFORE, Plaintiffs, Wright Medical Technology, Inc. and Surgical Technologies, LLC, pray for the following:

1.    That the Court declares Kevin Darr to be in violation of his non-compete agreement with Wright;

10

2.     That the Court declares Charles Hall to be in violation of his non-compete agreement with Surgical Technologies;

3.     That the Court issue emergency and permanent injunctive relief against Kevin Darr and Charles Hall to enforce the terms of their non-compete agreements;

4.     That they be awarded judgment against Defendants for all damages caused by their violations of the Arkansas Trade Secrets Act, and their wrongful interference with their legitimate business expectancies;

5.     That Surgical Technologies be awarded judgment against Kevin Darr and Charles Hall for all damages caused by their breaches of the duty of loyalty;

6.     That they be awarded punitive damages against Defendants for their intentional and malicious behavior toward Plaintiffs;

7.     That they be awarded their costs herein expended, including reasonable attorney's fees pursuant to Ark. Code Ann. § 16-22-308 and the Arkansas Trade Secrets Act, against Defendants; and

8.     That they be awarded all other relief to which they may be entitled.

M JCH01 2040243 v5
2789037-000027

Respectfully submitted,

WRIGHT MEDICAL TECHNOLOGY, INC.,
Plaintiff

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC
165 Madison Avenue
First Tennessee Building
Memphis, TN  38103
901-526-2000 (phone)
901-577-2303 (fax)

By: _____
Bruce A. McMullen (AR #97052)
bmcmullen@bakerdonelson.com

SURGICAL TECHNOLOGIES, LLC,
Plaintiff

BOWEN LAW FIRM, PLLC
P.O. Box 7273
Little Rock, AR  72217
501-614-3800 (phone)
501-614-3804 (fax)

By: _____
Martin W. Bowen (AR 90095)
bowen@bowenlaw.us

EXHIBIT A

## SALES REPRESENTATIVE AWARD AGREEMENT

THIS AGREEMENT, made as of March, 21, 2006 (the "Effective Date"), by and between Wright Medical Group, Inc., a Delaware corporation ("WMG"), and Kevin Darr (the "Participant").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

WHEREAS, the Participant is currently performing non-employee services for Wright Medical Technology, Inc., a Delaware corporation and wholly-owned subsidiary of WMG ("WMT" and, together with WMG and WMG's Related Entities, the "Company"), related to the promotion and sales of orthopedic implant devices manufactured by WMT, including related improvements and line extensions, pursuant to that certain agreement, effective April, 2001, between WMT's distributor, Paul Massa/Surgical Technologies, and Kevin Darr (the "Sales Representative Agreement"); and.

WHEREAS, the Company desires to afford the Participant the opportunity to acquire ownership of WMG's common stock, par value $.01 per share ("Common Stock"), so that the Participant may have a direct proprietary interest in the Company's success.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, the parties hereby agree as follows:

1.  Grant of Options.  Subject to the terms and conditions set forth herein and in the Amended and Restated Wright Medical Group, Inc. 1999 Equity Incentive Plan, a copy of which is attached hereto as Exhibit A (the "Plan"), on the Effective Date the Company does hereby grant to the Participant, during the period commencing on the Effective Date and ending on the 10th anniversary of the Effective Date (the "Expiration Date"), the right and option (the right to purchase any one share under this Agreement being an "Option") to purchase 300 shares of Common Stock.  The Option to purchase such Common Stock shall have an exercise price of 20.19 per share.  Each of the Options granted pursuant to this Agreement shall constitute Nonqualified Stock Options under the Plan.

2.  Limitations on Exercise of Options.

    (a)   Subject to the terms and conditions set forth herein and in the Plan, the Options shall vest and become exercisable, on a cumulative basis, with respect to 25% of the shares on the first anniversary of the Effective Date and on each succeeding anniversary thereafter so long as the Participant is employed by the Company; provided, however, upon the occurrence of a Change of Control, as defined below, all of the then unvested Options shall automatically vest and be fully exercisable and shall remain so exercisable in accordance with the terms of this Agreement. The Committee or the Board may accelerate the vesting and exercisability of any or all of the then-unvested Options at any time.

    (b)   For purposes of this Agreement, a "Change of Control" shall mean:

        (i)   The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person") of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more (on a fully diluted basis) of either (A) the then outstanding shares of common stock of the Company, taking into account as outstanding for this purpose such common stock issuable upon the exercise of options or

warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such common stock (the "Outstanding Company Common Stock") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (i), the following acquisitions shall not constitute a Change of Control: (w) any acquisition pursuant to an initial public offering of shares of common stock of the Company pursuant to a registration statement declared effective under the Securities Act of 1933, as amended, (x) any acquisition by the Company or any "affiliate" of the Company, within the meaning of 17 C.F.R. § 230.405 (an "Affiliate"), (y) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate, (z) any acquisition by any corporation or business entity pursuant to a transaction which complies with clauses (A), (B) and (C) of subsection (ii) of this Section 2(b) (persons and entities described in clauses (w), (x), (y) and (z) being referred to herein as "Permitted Holders"); or

(ii)     The consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any Permitted Holder) beneficially owns, directly or indirectly, 50% or more (on a fully diluted basis) of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination, taking into account as outstanding for this purpose such common stock issuable upon the exercise of options or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such common stock, or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the incumbent Board at the time of the execution of the initial agreement providing for such Business Combination; or

(iii)  The approval by the shareholders of the Company of a complete liquidation or dissolution of the Company; or

(iv)  The sale of at least 80% of the assets of the Company to an unrelated party, or completion of a transaction having a similar effect; or

The individuals who on the date of this Agreement constitute the Board thereafter cease to constitute at least a majority thereof; provided that any person becoming a member of the Board subsequent to the date of this Agreement and whose election or nomination was approved by a vote of at least two-thirds of the directors who then comprised the Board immediately prior to such vote shall be considered a member of the Board on the date of this Agreement.

3.  Non-Transferable.  Except as specifically authorized by the Committee, the Participant may not transfer the Options except by will or the laws of descent and distribution and the Options shall be exercisable during the Participant's lifetime only by the Participant or, in the event of his incapacity, his guardian or legal representative. Except as so authorized, no purported assignment or transfer of the Options, or of the rights represented thereby, whether voluntary or involuntary, by operation of law or otherwise (except by will or the laws of descent and distribution), shall vest in the assignee or transferee any interest or right herein whatsoever.

4.  Termination of Service.  (a) Disability.  If, prior to the Expiration Date, the Participant's Service shall cease by reason of a Disability, as defined in the Plan, or the Participant's Service shall cease for any reason with the written consent of the Committee, then the Options shall remain exercisable until the earlier of the Expiration Date or the date that is thirty (30) days after the date of such cessation of Service, but only to the extent the Options were vested and exercisable at the time of such cessation of Service.

(b)  Without Cause.  If the Company terminates the Participant's Service without Cause, then the Options shall remain exercisable until the earlier of the Expiration Date or the date that is ninety (90) days after the date of such cessation of Service.

(c)  Voluntary; for Cause.  If the Participant's Service is voluntarily terminated by the Participant for reasons other than Disability and without the consent of the Committee or the Company terminates the Participant's Service for Cause, then all of the Options, to the extent not exercised prior to such termination, whether exercisable or not, shall lapse and be canceled immediately upon such cessation of Service.

(d)  Death.  If the Participant's Service shall cease prior to the Expiration Date by reason of death, or the Participant shall die while entitled to exercise any of the Options pursuant to Section 4(a) or 4(b), the executor or administrator of the estate of the Participant or the person or persons to whom the Options shall have been validly transferred by the executor or administrator pursuant to will or the laws of descent and distribution shall have the right, until the earlier of the Expiration Date or one (1) year after the date of death, to exercise the Options, but only to the extent that the Participant was entitled to exercise them on the date of death and subject to any other limitation contained herein on the exercise of the Options in effect on the date of exercise.

(e)  Whether Service has been or could have been terminated for the purposes of this Agreement, and the reasons therefor, shall be determined by the Committee, whose determination shall be final, binding and conclusive.

(f)  Options that have not yet vested at the time of termination of the Participant's Service shall expire and no further vesting shall occur with respect thereto. After the expiration of any exercise period described in this Section 4, the Options shall terminate together with all of the Participant's rights hereunder, to the extent not previously exercised.

5.  Adjustments and Corporate Reorganizations.  In accordance with and subject to the applicable terms of the

Plan, the Options shall be subject to adjustment or substitution, as determined by the Committee, as to the number, price or kind of Stock or other consideration subject to such Options or as otherwise determined by the Committee to be equitable (i) in the event of changes in the outstanding Stock or in the capital structure of the Company by reason of stock dividends, stock splits, reverse stock splits, recapitalizations, reorganizations, mergers, consolidations, combinations, exchanges, or other relevant changes in capitalization occurring after the date hereof or (ii) in the event of any change in applicable laws or any change in circumstances which results in or would result in any substantial dilution or enlargement of the rights granted to, or available for, the Participant. The Company shall give the Participant written notice of an adjustment hereunder. Notwithstanding anything herein to the contrary, in the event of any of the following:

(a)     The Company is merged or consolidated with another corporation or entity and, in connection therewith, consideration is received by shareholders of the Company in a form other than stock or other equity interests of the surviving entity;

(b)     All or substantially all of the assets of the Company are acquired by another person;

(c)     The Company's reorganization or liquidation; or

(d)     The Company shall enter into a written agreement to undergo an event described in clauses (a), (b) or (c) above,

then the Committee may, in its discretion and upon at least 10 days advance notice to the affected persons, cancel any outstanding Options and pay to the Participant, in cash, the value of such Options based upon the price per share of Stock received or to be received by other shareholders of the Company in such event and the per share exercise price of the Options.

6.     Exercise:  Payment For and Delivery of Common Stock.  The Options shall be exercised by delivering written notice to the Committee stating the number of shares of Common Stock to be purchased, the person or persons in whose name the shares of Common Stock are to be registered and each such person's address and social security number. Such notice shall not be effective unless accompanied by the full purchase price for all shares to be purchased, and any applicable withholding (as described below). The purchase price shall be payable in cash, in shares of Common Stock, any combination of cash or shares of Common Stock or any other method authorized by the Plan and consented to by the Committee; provided, however, that the Participant may use Common Stock in payment of the exercise price only if the shares so used are considered "mature" for purposes of generally accepted accounting principles (i.e., (i) been held by the Participant free and clear for at least six (6) months prior to the use thereof to pay part of an Option exercise price, (ii) been purchased by the Participant in other than a compensatory transaction, or (iii) meet any other requirements for "mature" shares as may exist on the date of the use thereof to pay part of an Option exercise price). In the event that all or part of the purchase price is paid in shares of Common Stock, the shares used in payment shall be valued at their Fair Market Value on the date of exercise of the Options. At the time of exercise, the Participant shall pay to the Company, in cash, or by having the Company withhold upon exercise of the Option a sufficient number of shares of Common Stock otherwise deliverable to the Participant based on the Fair Market Value of the Common Stock on the date of exercise, at the election of the Participant, such minimum amount as the Company deems necessary to satisfy its obligation to withhold Federal, state or local income or other taxes incurred by reason of the exercise or the transfer of shares thereupon. Payment in currency or by certified or cashier's check shall be considered payment in cash.

7.     Restrictive Covenants; Repurchase Rights.  (a)  By accepting the Options, the Participant represents and agrees for himself and his transferees (whether by will or the laws of descent and distribution) that:

(i) For the period commencing on the date of this Agreement and ending on the first one year anniversary of the termination of the Participant's service (such period is hereinafter referred to as the "Restricted Period"), with respect to any geographic territories in which the Company is

engaged in business during the period for which the Participant is engaged to provide Service and, for the one year period following such period of Service, with respect to the territory of the Participant's Service (such periods are hereinafter referred to as the "Restricted Period"), the Participant shall not participate or engage, directly or indirectly, for himself or herself or on behalf of or in conjunction with any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, shareholder, partner, joint venturer, investor or otherwise, (other than a limited partner or stockholder of less than one percent of the issued and outstanding limited partnership interests or stock of a publicly held partnership or corporation whose gross assets exceed $1,000,000) in the distribution, solicitation, promotion, manufacture, design, development, or sale of any medical products or services competitive with products manufactured, marketed, or sold by the Company or any of its subsidiaries or any medical products or services intended to be manufactured, marketed, or sold by the Company of the same general type or function. The parties intend the restrictions in this Paragraph 7 to be completely severable and independent, and any invalidity or unenforceability of any one or more of such restrictions shall not render invalid or unenforceable any one or more restrictions.

(ii)  Except with the Company's prior written approval or as may otherwise be required by law or legal process, the Participant shall not disclose any material or information which is confidential to the Company and not in the public domain or generally known in the industry, whether tangible or intangible, made available, disclosed or otherwise known to the Participant as a result of the Participant's Service.

(iii)  During the Restrictive Period, the Participant shall not attempt to influence, persuade or induce, or assist any other person in so persuading or inducing, any employee of the Company to give up, or to not commence, employment or a business relationship with the Company.

(b)  In addition to all other legal and equitable remedies available to it, the Company shall have the right, and not the obligation, to purchase and acquire from the Participant any or all of the shares of Common Stock previously acquired by the Participant upon exercise of the Option (the "Repurchased Shares") if the Committee elects to take such action, in its absolute discretion, on the basis of the Committee's determination that the Participant has violated any of the covenants set forth in this Agreement or if the Participant's Service shall be terminated or could have been terminated for Cause. The Company may exercise the right granted to it under this Section 7(b) by delivering written notice to the Participant stating that the Company is exercising the repurchase right granted to it under this Section 7(b).   The delivery of such notice by the Company to the Participant shall constitute a binding commitment of the Company to purchase and acquire all of the Repurchased Shares. The total purchase price for the Repurchased Shares shall be delivered to the Participant against delivery by the Participant of certificates evidencing the Repurchased Shares no later than 30 days after the delivery of the election notice by the Company.   The price per share of the Repurchased Shares shall be the lesser of the Fair Market Value of each of the Repurchased Shares on the date of the Company's delivery of its written notice to the Participant or the exercise price of the Option.

(c)  In addition to all other legal and equitable remedies available to it, the Company shall have the right, and not the obligation, to cancel any or all of the Participant's Options if the Committee elects to take such action, in its absolute discretion, on the basis of the Committee's determination that the Participant has violated the covenants set forth in this Agreement.   The Company may exercise the right granted to it under this Section 7(c) by delivering a written notice to the Participant stating that the Company is exercising the cancellation right granted to it under this Section 7(c).

(d)  Anything in this Section 7 to the contrary, the Company shall not be obligated to

purchase any Common Stock at any time to the extent that the purchase would result in a violation of any law, statute, rule, regulation, order, writ, injunction, decree or judgment promulgated or entered by any Federal, state, local or foreign court or governmental authority applicable to the Company or any of its property.

8.   Rights as Stockholder; Representations.  (a)  The Participant or a transferee of the Options shall have no rights as a stockholder with respect to any shares covered by the Options until he shall have become the holder of record of such shares (and the Company shall use its reasonable best efforts to cause the Participant promptly to become the holder of record of such shares), and, except as provided in Section 5 hereof, no adjustment shall be made for dividends or distributions or other rights in respect of such shares for which the record date is prior to the date upon which he shall become the holder or record thereof.

(b)  The Participant acknowledges and agrees that any Common Stock acquired in respect of the Options granted under Section 2 shall be "Shares" as such term is used in the Stockholders Agreement, dated as of December 7, 1999, among WMG and certain "Investors" listed in Schedule I thereto, and, as such, will be subject to certain restrictions, including restrictions on resale and such other transfers.  In the event of any conflict or inconsistency between the terms and provisions of this Agreement and the Stockholders Agreement, the Stockholders Agreement shall govern and control.

(c)  By accepting the Options, the Participant represents and warrants for himself and his transferees (whether by will or the laws of descent and distribution) that:

(i)   The sale and marketing of the Company's products by the Participant are the Participant's primary trade or business; and

(ii)  During the last calendar year the Participant derived, and during the next calendar year the Participant expects to derive, the majority of the Participant's earned income from the sales and marketing of the Company's products.

9.   Company; Participant.  (a)  The term "Company" as used in this Agreement shall include the Company and its Related Entities, except to the extent otherwise indicated by the context or usage.

(b)  Whenever the word "Participant" is used in any provision of this Agreement under circumstances where the provision should logically be construed to apply to the executors, the administrators, legal representatives, the person or persons to whom the Options may be transferred by will or by the laws of descent and distribution or any other transferee to whom the Options may be transferred with the consent of the Committee, the word "Participant" shall be deemed to include such person or persons.

10.   Requirements of Law.  (a)  By accepting the Options, the Participant represents and agrees for himself and his transferees (whether by will or the laws of descent and distribution) that, unless a registration statement under the Securities Act of 1933, as amended (the "Act"), is in effect as to shares purchased upon any exercise of the Options, (i) any and all shares so purchased shall be acquired for his personal account and not with a view to or for sale in connection with any distribution, and (ii) each notice of the exercise of any portion of this Option shall be accompanied by a representation and warranty in writing, signed by the person entitled to exercise the same, that the shares are being so acquired in good faith for his personal account and not with a view to or for sale in connection with any distribution.

(b)  No certificate or certificates for shares of Common Stock may be purchased, issued or transferred if the exercise hereof or the issuance or transfer of such shares shall constitute a violation by the Company or the Participant of any (i) provision of any Federal, state or other securities law, (ii)

requirement of any securities exchange listing agreement to which the Company may be a party, or (iii) other requirement of law or of any regulatory body having jurisdiction over the Company. Any reasonable determination in this connection by the Board, upon notice given to the Participant, shall be final, binding and conclusive.

(c) The certificates representing shares of Common Stock acquired pursuant to the exercise of Options shall carry such appropriate legend, and such written instructions shall be given to the Company's transfer agent, as may be deemed necessary or advisable by counsel to the Company in order to comply with the requirements of the Act or any state securities laws.

11. <u>Notices</u>. Any notice to be given to either party shall be in writing and shall be given by hand delivery to such party or by registered or certified mail, return receipt requested, postage prepaid, addressed to the Company in care of its Secretary at its principal office, and to the Participant at the address given beneath his signature hereto, or at such other address as either party shall have furnished to the other in writing in accordance herewith. Notice and communications shall be effective when actually received by the addressee.

12. <u>Binding Effect</u>. This Agreement shall be binding upon the heirs, executors, administrators, successors and permitted assigns of the parties hereto.

13. <u>The Plan</u>. The terms and provisions of the Plan are incorporated herein by reference and made a part hereof as though fully set forth herein. In the event of any conflict or inconsistency between discretionary terms and provisions of this Agreement, this Agreement shall govern and control. In all other instances of conflicts or inconsistencies or omissions, the terms and provisions of the Plan shall govern and control. All capitalized terms not otherwise expressly defined in this Agreement shall have the meaning ascribed to them in the Plan.

14. <u>Governing Law</u>. This Agreement shall be construed and interpreted in accordance with the laws of the State of Tennessee, without regard to the principles of conflicts of law thereof.

15. <u>Entire Agreement</u>. This Agreement, together with the Plan, contains the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto. This Agreement, and this integration clause, is not intended to, and does not, limit or alter in any manner, the parties' obligations under any previous agreement concerning obligations to maintain confidentiality or with respect to restrictive covenants, including, but not limited to, any Nondisclosure Agreement, Confidentiality and Inventions Agreement, Employment Agreement, Distributor Agreement, Sales Representative Agreement, or any similar agreement between the parties, all of which obligations shall remain in full force and effect.

IN WITNESS WHEREOF, the Company has granted this Option on the date of grant specified above. This instrument may be executed in any number of counterparts, each of which shall be deemed to be an original, and such counterparts together shall constitute one and the same instrument.

WRIGHT MEDICAL GROUP, INC.

By: _____
    Jason P. Hood, Vice President, General
    Counsel & Secretary

ACCEPTED: _____

_____
Kevin Darr
2804 Nottingham Way
Jonesboro, AR  72404
USA

EXHIBIT B

**WRIGHT MEDICAL GROUP, INC.**
**Restricted Stock Grant Agreement**
**Sales Representative**

| **Award Granted to ("Grantee"):** | **Grant Date:** | **Number of Shares ("Shares"):** |
|---|---|---|
| **Kevin Darr** | **March 4, 2008** | **135** |

THIS RESTRICTED STOCK GRANT AGREEMENT (the "Agreement") is made as of the Grant Date by and between Wright Medical Group, Inc., a Delaware corporation with its principal place of business at 5677 Airline Road, Arlington, Tennessee 38002 (the "Company") and Grantee pursuant to the Wright Medical Group, Inc. 1999 Equity Incentive Plan, as amended from time to time (the "Plan") and which is hereby incorporated by reference.

WHEREAS, Grantee is associated with the Company or its affiliate as sales representative; and

WHEREAS, the Compensation Committee of the Company's Board of Directors (the "Committee") has authorized that Grantee be granted shares of the Company's Common Stock ("Stock") subject to the restrictions stated below;

NOW, THEREFORE, the parties agree as follows:

1.  *Grant of Stock*. Subject to the terms and conditions of this Agreement and of the Plan, the Company hereby grants to Grantee the Shares.

2.  *Vesting Schedule*. The interest of Grantee in the Shares shall vest as to one-fourth (¼) of the Shares on the first anniversary of the Grant Date, and as to an additional one-fourth (¼) on each succeeding anniversary date, so as to be 100% vested on the fourth anniversary thereof, conditioned upon Grantee's continued association with the Company as of each vesting date. Notwithstanding the foregoing, the interest of Grantee in the Shares shall vest as to:

    2.1.  100% of the then unvested Shares upon a Change of Control.  For purposes of this Agreement a "Change of Control" shall mean the first to occur on or after the Grant Date of any of the following:  The acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) (a "Person")) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more (on a fully diluted basis) of either (A) the then outstanding shares of Stock, taking into account as outstanding for this purpose such Stock issuable upon the exercise of options or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such Stock (the "Outstanding Company Common Stock") or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote generally in the election of directors (the "Outstanding Company Voting Securities"); provided, however, that for purposes of this subsection (a), the following acquisitions shall not constitute a Change of Control:  (x) any acquisition by the Company or any "affiliate" of the Company, within the meaning of 17 C.F.R. § 230.405 (an "Affiliate"), (y) any acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Affiliate, (z) any acquisition by any corporation or business entity pursuant to a transaction which complies with clauses (A) and (B) of subsection (a) of this Section 2.1 (persons and entities described in clauses (x), (y), and (z) being referred to herein as "Permitted Holders");

        (a)     The consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), in each case, unless, following such Business Combination, (A) all or substantially all of the individuals and entities who were the beneficial owners, respectively, of the Outstanding

Company Common Stock and Outstanding Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination, of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (B) no Person (excluding any Permitted Holder) beneficially owns, directly or indirectly, 50% or more (on a fully diluted basis) of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination, taking into account as outstanding for this purpose such common stock issuable upon the exercise of options or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such common stock, or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination, and (C) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the incumbent Board at the time of the execution of the initial agreement providing for such Business Combination;

(b)     The approval by the stockholders of the Company of a complete liquidation or dissolution of the Company;

(c)     The sale of at least 80% of the assets of the Company to an unrelated party, or completion of a transaction having a similar effect; or

(d)     The individuals who on the date of this Agreement constitute the Board of Directors thereafter cease to constitute at least a majority thereof; provided that any person becoming a member of the Board of Directors subsequent to the date of this Agreement and whose election or nomination was approved by a vote of at least two-thirds of the directors who then comprised the Board of Directors immediately prior to such vote shall be considered a member of the Board of Directors on the date of this Agreement.

2.2.     100% of the unvested Shares upon Grantee's death.

3.  *Restrictions.*

3.1.     The Shares granted hereunder may not be sold, pledged or otherwise transferred until the Shares become vested in accordance with this Agreement. The period of time between the Grant Date and the date the Shares become vested is referred to as the "Restriction Period."

3.2.     If Grantee's association with the Company is terminated, the balance of the Shares subject to the provisions of this Agreement which have not vested at the time of Grantee's termination shall be forfeited by Grantee, and ownership transferred back to the Company.

3.3.     By accepting the Shares, Grantee represents and agrees for himself and his transferees (whether by will or the laws of descent and distribution) that:

(a)     For the period commencing on the Grant Date and ending on the first anniversary of the termination of Grantee's service (such period is hereinafter referred to as the "Covenant Period "), with respect to any geographic territories in which the Company is engaged in business during the period for which Grantee provided service to the Company, Grantee shall not participate or engage, directly or indirectly, for himself or on behalf of or in conjunction with any person, partnership, corporation or other entity, whether as an employee, agent,

officer, director, stockholder, partner, joint venturer, investor or otherwise, (other than a limited partner or stockholder of less than one percent of the issued and outstanding limited partnership interests or stock of a publicly held partnership or corporation whose gross assets exceed $1,000,000) in the distribution, solicitation, promotion, manufacture, design, development, or sale of any medical products or services competitive with products manufactured, marketed, or sold by the Company or any of its subsidiaries or any medical products or services intended to be manufactured, marketed, or sold by the Company of the same general type or function.

(b)     Except with the Company's prior written approval or as may otherwise be required by law or legal process, Grantee shall not disclose any material or information which is confidential to the Company or its subsidiaries and not in the public domain or generally known in the industry, whether tangible or intangible, made available, disclosed or otherwise known to Grantee as a result of his service with the Company.

(c)     During the Covenant Period, Grantee shall not attempt to influence, persuade or induce, or assist any other person in so persuading or inducing, any employee of the Company or its subsidiaries to give up, or to not commence, employment or a business relationship with the Company.

3.4.    The Company shall have the right, but not the obligation, to purchase and acquire from Grantee any or all of the Shares (the "Repurchased Shares") if the Committee reasonably determines that Grantee has violated the covenants set forth in this Agreement or Grantee's service is terminated or could have been terminated for Cause (as defined in the Plan). The Company may exercise the right granted to it under this Section 3.4 by delivering written notice to Grantee stating that the Company is exercising the repurchase right granted to it under this Section 3.4. The delivery of such notice by the Company to Grantee shall constitute a binding commitment of the Company to purchase and acquire all of the Repurchased Shares. The total purchase price for the Repurchased Shares shall be delivered to the Participant against delivery by Grantee of certificates evidencing the Repurchased Shares no later than 30 days after the delivery of the election notice by the Company. The price per share of the Repurchased Shares shall be the lesser of 1) the Fair Market Value (as defined in the Plan) of each of the Repurchased Shares on the date of the Company's delivery of its written notice to Grantee or 2) the Fair Market Value of each of the Repurchased Shares on the date that such shares vested to the Grantee without regard to any election by the Grantee under Section 83(b) of the Internal Revenue Code of 1986, as amended.

3.5.    The Company shall have the right, but not the obligation, to cancel any or all of the Shares if the Committee reasonably determines that Grantee has violated the covenants set forth in this Agreement. The Company may exercise the right granted to it under this Section 3.5 by delivering a written notice to Grantee stating that the Company is exercising the cancellation right granted to it under this Section 3.5.

3.6.    Notwithstanding anything in this Section 3 to the contrary, the Company shall not be obligated to purchase any Stock at any time to the extent that the purchase would result in a violation of any law, statute, rule, regulation, order, writ, injunction, decree or judgment promulgated or entered by any Federal, state, local or foreign court or governmental authority applicable to the Company or any of its property.

3.7.    The parties intend the restrictions in Section 3.3 to be completely severable and independent, and any invalidity or unenforceability of any one or more such restrictions shall not render invalid or unenforceable any one or more restrictions.

4.  *Legend.* All certificates representing any shares of Stock subject to the provisions of this Agreement

shall have endorsed thereon the following legend:

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RESTRICTED STOCK GRANT AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THIS COMPANY.

5. *Escrow.* The certificate or certificates evidencing the Shares subject hereto shall be delivered to and deposited with the Secretary of the Company as Escrow Agent in this transaction. The Shares may also be held in a restricted book entry account in the name of Grantee. Such certificates or such book entry shares are to be held by the Escrow Agent until termination of the Restriction Period, when they shall be released by the Escrow Agent to Grantee.

6. *Stockholder Rights.* During the Restriction Period, Grantee shall have all the rights of a stockholder with respect to the Shares except for the right to transfer the Shares as set forth in Section 3 and except as set forth in Section 7. Accordingly, Grantee shall have the right to vote the Shares and to receive any cash dividends paid to or made with respect to the Shares.

7. *Changes in Stock.* In the event that as a result of (i) any stock dividend, stock split or other change in the Stock, or (ii) any merger or sale of all or substantially all of the assets or other acquisition of the Company, and by virtue of any such change Grantee shall in Grantee's capacity as owner of unvested shares of Stock which have been awarded to Grantee (the "Prior Stock") be entitled to new or additional or different shares or securities, such new or additional or different shares or securities shall thereupon be considered unvested Shares and shall be subject to all of the conditions and restrictions which were applicable to the Prior Stock pursuant to this Agreement.

8. *Permanent and Total Disability of Grantee.* In the event of the permanent and total disability of Grantee, any unpaid but vested Shares shall be paid to Grantee if legally competent or to a legally designated guardian or representative if Grantee is legally incompetent.

9. *Death of Grantee.* In the event of Grantee's death after the vesting date but prior to the payment of the Shares, such Shares shall be paid to Grantee's estate or designated beneficiary.

10. *Taxes.* Grantee understands that Grantee will recognize income for federal and, if applicable, state income tax purposes in an amount equal to the amount by which the fair market value of the Shares, as of the Grant Date or vesting date, as applicable, exceeds any consideration paid by Grantee for such Shares. Grantee shall be liable for any and all taxes, including withholding taxes, arising out of this grant or the vesting of Shares hereunder. By accepting the Shares, Grantee covenants to report such income in accordance with applicable federal and state laws. To the extent that the receipt of the Shares or the end of the Restriction Period results in income to Grantee and withholding obligations of the Company, including federal or state withholding obligations, Grantee agrees that the Company shall retain and instruct a registered broker(s) to sell such number of Shares necessary to satisfy the Company's withholding obligations, after deduction of the broker's commission, and the broker shall remit to the Company the cash necessary in order for the Company to satisfy its withholding obligations. Grantee covenants to execute any such documents as are requested by the broker of the Company in order to effectuate the sale of the Shares and payment of the tax obligations to the Company. The Grantee represents to the Company that, as of the date hereof, he or she is not aware of any material nonpublic information about the Company or the Shares. The Grantee and the Company have structured this Agreement to constitute a "binding contract" relating to the sale of Shares pursuant to this Section, consistent with the affirmative defense to liability under Section 10(b) of the Exchange Act under Rule 10b5-1(c) promulgated under the Exchange Act.

11. *Representations.* By accepting the Shares, Grantee represents and warrants for himself and his transferees (whether by will or the laws of descent and distribution) that:

Restricted Stock Grant Agreement
Page 5

---

(a)    The sale and marketing of the Company's products by Grantee are Grantee's primary trade or business.

(b)    During the most recently ended calendar year Grantee derived, and during the current calendar year Grantee expects to derive, the majority of Grantee's earned income from the sales and marketing of the Company's products.

12. *Miscellaneous.*

12.1.   The Company shall not be required (i) to transfer on its books any shares of Stock of the Company which have been sold or transferred in violation of any provisions set forth in this Agreement, or (ii) to treat as owner of such shares or to accord the right to vote as such owner or to pay dividends to any transferee to whom such shares shall have been so transferred.

12.2.   The parties agree to execute such further instruments and to take such action as may be reasonably necessary to carry out the intent of this Agreement.

12.3.   Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon delivery to Grantee at the address of Grantee then on file with the Company.

12.4.   Neither the Plan nor this Agreement nor any provisions under either shall be construed so as to grant Grantee any right to remain associated with the Company or any of its affiliates.

12.5.   This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

AGREED AND ACCEPTED:

GRANTEE:                                          WRIGHT MEDICAL GROUP, INC.

_____        By: _____
                                                Jason P. Hood, Vice President,
                                                General Counsel, and Secretary

EXHIBIT C

01-04-2010  00:04:00  FROM-GMC OR SCHEDULING OFFICE       070 001 1111       T-442  P.002/003  F-052

# SURGICAL TECHNOLOGIES



## WRIGHT

619 Timber Creek Drive · Suite A
Clinton, Tennessee 38312
Phone 903-731-5700
FAX 903-731-5714

February 26, 2007

Charles Hall
3719 Sullivan
Jonesboro, Arkansas 72404

Charles-

The following agreement is between Surgical Technologies and Charles Hall.
The effective date is 2/26/07. Either party can end this agreement with a (30) day
written notice.

1.) Ninety Day responsibilities are :
    a.  Be able to assemble Advance Knee instruments and bipolar
        instruments within 30 days
    b.  Know how to attend a bipolar hip case with proper
        instruments/implants within 60 days
    c.  Know how to attend an Advance Knee case with proper
        instruments/implants within 90 days
2.) After the above knowledge is obtained, you'll use this to provide sales service
    on a daily basis to the Jonesboro orthopaedic market under the direction of
    Kevin Darr.
3.) Surgical Technologies will pay a yearly income of $ 24,000 to Charles Hall.
    This will be paid bi-monthly.
4.) Any agreed upon expenses, such as, fuel to and from Memphis or travel
    expenses to sales training will be paid by Surgical Technologies.
5.) For a period of one year after termination of this agreement, with Charles
    Hall, he shall not participate or engage with any person or company that have
    products competitive with Wright Medical Technology. The counties in
    Arkansas that Charles Hall cannot compete for one year are Craighead,
    Greene, Randolph, Baxter, Independence and Sharp.

Paul Meece/ Kevin Darr

Charles Hall

**EXHIBIT**
**A**