**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

WRIGHT MEDICAL GROUP, INC., d/b/a                                    PLAINTIFFS
WRIGHT MEDICAL TECHNOLOGY, INC.
and SURGICAL TECHNOLOGIES, LLC

v.                                    Case No. 3:10CV00033 JLH

KEVIN DARR, CHARLES HALL, and
MARK STARRING & ASSOCIATES, INC.                                    DEFENDANTS

<u>**OPINION AND ORDER**</u>

Plaintiffs Wright Medical Group, Inc., and Surgical Technologies, LLC, commenced this

action against Kevin Darr, Charles Hall, and Mark Starring & Associates, seeking enforcement of

Darr's and Hall's respective noncompetition agreements[1] and alleging violations of the Arkansas

Trade Secrets Act, interference with contractual relations, and breach of duty of loyalty.  This Court

has subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332.  Darr

and Hall have filed a motion for partial summary judgment on the issue of enforceability of their

respective covenants not to compete.  In addition, Hall moves for summary judgment on all of

Surgical Technologies's claims against him on the grounds that Surgical Technologies's legal status

as a Limited Liability Company had been revoked when he began working there.  For the following

reasons, the plaintiffs' motion for partial summary judgment is granted in part and denied in part.

**I.**

Wright Medical is an orthopedic medical device company that designs, manufactures, and

markets reconstructive joint devices and biologics.  It operates globally.  Surgical Technologies is

a distributor of Wright Medical's products.  Darr was a sales representative who sold Wright

---

[1] Darr was an employee of Wright Medical.  Hall was an employee of Surgical
Technologies.

Medical's devices under the auspices of Surgical Technologies.  Wright Medical's regional sales manager for the southern United States has testified that he considered Darr an employee of Wright Medical for purposes of sharing trade secrets and providing for noncompetition agreements, even though Darr was issued a 1099 rather than a W-2.  Hall was employed by Surgical Technologies to assist Darr.  Darr and Hall were located in Jonesboro, Arkansas, which is in Craighead County.  They terminated their relationships with Wright Medical and Surgical Technologies effective December 31, 2009, and went to work on January 1, 2010, for Mark Starring & Associates, Inc., which distributes reconstructive joint devices and biologics for another manufacturer in competition with Wright Medical and Surgical Technologies.  Hall had a noncompetition agreement with Surgical Technologies, while Darr had several agreements containing noncompetition clauses with Wright Medical over a period of years.

Wright Medical and Surgical Technologies assert that when Darr and Hall left their employ and began working for Mark Starring & Associates, they both breached their respective noncompetition agreements.  Shortly after filing their complaint, the plaintiffs filed separate motions for a preliminary injunction prohibiting the defendants from continuing to violate their noncompetition agreements and to cause injury to the plaintiffs.  On March 18, 2010, this Court conducted a preliminary injunction hearing in Jonesboro, Arkansas.  For the reasons stated on the record at that hearing, the Court denied the plaintiffs' motions for emergency injunctive relief.

Almost three months later, defendants Darr and Hall filed this motion for partial summary judgment.  Hall seeks summary judgment on all of Surgical Technologies's claims against him, arguing that Surgical Technologies could not enter into a binding contract after it had been administratively dissolved.  Darr and Hall also seek summary judgment on the issue of the

2

enforceability of their respective noncompetition agreements with the defendants.

## II.

A court should enter summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850 (8th Cir. 2005).  The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the moving party carries its burden, the nonmoving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1985) (quoting FED. R. CIV. P. 56(e)) (emphasis in original).  A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511. When a nonmoving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

## III.

### A.    SURGICAL TECHNOLOGIES'S LEGAL STATUS

Hall moves for summary judgment on all of Surgical Technologies's claims against him, arguing that they had no contractual relationship since Surgical Technologies's legal status as an LLC had been revoked when he began working there.  Hall contends that Surgical Technologies's

legal status as an LLC was revoked by the Tennessee Secretary of State on August 21, 2006.  His employment with Surgical Technologies began subsequent to that, on February 26, 2007.  Hall says that because Surgical Technologies did not exist as a legal entity, it could not be a contracting party for purposes of binding him to a valid noncompetition agreement.

In response, Surgical Technologies submits a printout of its filing information with the Tennessee Secretary of State.  That report indicates that it was reinstated on January 29, 2010.[2]  Surgical Technologies also cites to Tenn. Code Ann. § 48-249-606(c), which states: "When the reinstatement [of an administratively dissolved LLC] is effective, it relates back to and takes effect as of the effective date of the administrative dissolution, and the LLC resumes carrying on its business as if the administrative dissolution had never occurred."  Surgical Technologies says this "relation back" of its reinstatement renders Hall's argument moot.

Hall counters that Surgical Technologies's reading of the statue is in error.  Hall points to section 605(c), which states that an administratively dissolved LLC "continues its existence, but may not carry on any business except that necessary to wind up and liquidate its business and affairs . . . and notify its claimants. . . ."  Hall asserts that it follows that Surgical Technologies was not allowed to conduct any business, including contracting for Hall's employment, after it was administratively dissolved.  Hall also argues that a plain reading of the word "resumes" in section 606(c) indicates that only the administrative record activity relates back, and that the statute does not operate to ratify retroactively an invalid corporate action.

---

[2] At the March 18, 2010 preliminary injunction hearing, the Court noted that at that time Surgical Technologies was not registered to do business in the State of Arkansas.  A recent search of the Arkansas Secretary of State's website indicates that on May 27, 2010, Surgical Technologies registered with and is in good standing with the State of Arkansas.

The parties have not cited, nor has the Court found, any case law from Tennessee state or federal courts interpreting and applying the precise meaning of the specific sentence at issue in section 606(c).[3]  *Cf. River Links at Deer Creek, LLC v. Melz*, 108 S.W.3d 855, 861 (Tenn. Ct. App. 2002) ("There is very little case law dealing with the [Tennessee Limited Liability Company] Act, and none we could find that involves the retroactive effects flowing from the reinstatement of a company after its dissolution.").  However, giving that statute its plain meaning, the Court finds that Hall's reading is inaccurate.  Section 606(c) is comprised of two independent clauses, both of which appear to be modified by an opening temporal clause which states, "When the reinstatement is effective,".  The first clause plainly states that the *reinstatement* relates back to and *takes effect* as of the date of the LLC's administrative dissolution, that is, the effect of Surgical Technologies's retroactive reinstatement is such that Tennessee law looks upon it as never having been administratively dissolved in the first place.  In contrast to Hall's argument, section 606(c) does not state that it is only the administrative record that relates back—it says that the reinstatement relates back.  The second clause states, "and the LLC resumes carrying on its business as if the

---

[3] The only case to which Hall cites is *State v. Cauthern*, 967 S.W.2d 726 (Tenn. 1998). That case states: "[The Tennessee Supreme Court's] role in construing a statute is to determine and to give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.  We must determine the legislative intent from the plain language of the statute, read in context of the entire statute, without any forced or subtle construction which would extend or limit its meaning.  As a matter of statutory construction, a specific provision will control over a more general statutory provision.  Moreover, a statute is generally presumed to operate prospectively, unless the legislature indicates a specific intention otherwise."  *Cauthern*, 967 S.W.2d at 735 (internal cites and quotes omitted).  That, however, is where the relevance of that case ends.  *Cauthern* involved interpretation of an amendment adding life without the possibility of parole as a sentencing option alongside life imprisonment or death.  However, to the extent that the quoted language from *Cauthern* is helpful, the Court notes that Hall fails to recognize the applicability of the final sentence, which states that the legislature may indicate that a particular statute applies retroactively.

administrative dissolution had never occurred." The most reasonable construction of the second clause is that when Surgical Technologies's reinstatement became effective, it could resume carrying on its business from the date of that reinstatement as if the administrative dissolution had never occurred. Reading that clause in conjunction with the first independent clause, it seems apparent that the Tennessee statute would not require an LLC in Surgical Technologies's position to execute again every business transaction or contract in which it engaged over the period of time during which it had been administratively dissolved. *Cf. Barone v. Perkins*, 2008 WL 2468792 at *2 (Ky. Ct. App. June 20, 2008) (affirming a circuit court in holding that reinstatement of an LLC has "retroactive effect as if the administrative dissolution never occurred").

That the Tennessee courts would continue the Tennessee Limited Liability Act in this fashion is confirmed by their interpretation of a similar statutory provision concerning reinstatement of dissolved compensations. *See Wynn v. La Maruja Realty Corp.*, 2009 WL 2957922 (Tenn. Ct. App. Sept. 15, 2009) (construing Tenn. Code Ann. §§ 48-24-104(e) and 48-24-203(c) to provide that upon reinstatement of the corporate status, a contract of a dissolved corporation was retroactively validated); *Blaylock & Brown Const. Co., Inc. v. Collierville Bd. of Mayor and Aldermen*, 23 S.W.3d 316, 323-24 (Tenn. Ct. App. 1999) (holding that the reinstatement of a dissolved corporation restored its capacity to pursue an administrative appeal because the sole purpose of the statute authorizing revocation and reinstatement of corporate status is to raise revenue for the state); *Kerney v. Cobb*, 658 S.W.2d 128, 131 (Tenn. App. 1983) ("We believe it was the intent of the legislature in providing for reinstatement of the corporate charter under these circumstances to validate the corporation's privileges and existence from the date of revocation.").

B.    NONCOMPETITION AGREEMENTS

Because Arkansas law governs both Darr's and Hall's contracts, Arkansas law applies to their challenge to the validity of the noncompetition agreements in those contracts.  As the challenging parties, Darr and Hall have the burden to show that their respective noncompetition agreements are unreasonable.  *Dawson v. Temps Plus, Inc.*, 337 Ark. 247, 254, 987 S.W.2d 722, 726 (1999). Whether a covenant not to compete is unreasonable is a matter to be determined under the particular circumstances involved.  *HRR Arkansas, Inc. v. River City Contractors, Inc.*, 350 Ark. 420, 430, 87 S.W.3d 232, 239 (2002).  Arkansas courts will not enforce a covenant that merely prohibits ordinary competition.  *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 418, 994 S.W.2d 468, 472 (1999); *Statco Wireless, LLC v. Southwestern Bell Wireless, LLC*, 80 Ark. App. 284, 291, 95 S.W.3d 13, 16 (2003).  Covenants not to compete in employment contracts are subject to stricter scrutiny than those connected with a sale of a business.  *Dawson*, 337 Ark. at 254, 987 S.W.2d at 726.  For the noncompetition agreements to be valid, they must meet three requirements: (1) the party to be protected must have a valid interest to protect; (2) the geographical restrictions must not be overly broad; and (3) the time limit imposed must be reasonable.  *See Advanced Environmental Recycling Technologies, Inc. v. Advanced Control Solutions, Inc.*, 372 Ark. 286, 297, 275 S.W.3d 162, 172 (2008).  Because the Court finds that the validity of both agreements turns on the geographic restriction, the Court considers only that element.

1.    *Hall's Noncompetition Agreement with Surgical Technologies*

On February 26, 2007, Hall executed an employment contract with Surgical Technologies in Jonesboro, Arkansas.  Included in that contract was a noncompetition agreement, which stated:

> For a period of one year after termination of this agreement, with Charles Hall, he shall not participate or engage with any person or company that have products

competitive with Wright Medical Technology. The counties in Arkansas that Charles Hall cannot compete for one year are Craighead, Greene, Randolph, Baxter, Independence and Sharp.

To be enforceable, a geographical restriction in a noncompetition agreement must be limited. *Moore v. Midwest Distribution, Inc.*, 76 Ark. App. 397, 402, 65 S.W.3d 490, 494 (2002) (where employer did not conduct any business in Oklahoma, the noncompetition agreement restricting former employee from working in nine states, including Oklahoma, was too broad). In determining the reasonableness of the geographic restriction, the court must consider the trade area of the former employee. *Jaraki v. Cardiology Associates of Northeast Arkansas, P.A.*, 75 Ark. App. 198, 207, 55 S.W.3d 799, 804 (2001). "Where a geographic restriction is greater than the trade area, the restriction is too broad and the covenant not to compete is void." *Id.* (holding that geographic restriction was too broad where it extended beyond the employer's referral base and trade area).

At the preliminary injunction hearing, Paul Massa testified as the sole member and representative of Surgical Technologies. Massa testified that Surgical Technologies had no business to protect with any hospitals or doctors in Sharp County or Randolph County. In its response brief, Surgical Technologies admits that it had no sales in Sharp or Randolph County. Surgical Technologies argues, however, that its trade area is "northeast Arkansas," and since each county listed in the noncompetition agreement is located in northeast Arkansas, the trade area and geographic restriction are coextensive. That argument fails. First, the geographic restriction in Hall's contract does not restrict him from competing in Surgical Technologies's "trade area"—it restricts him from competing in five specific counties in northeast Arkansas. The Court will not rewrite the noncompetition agreement. *See Bendinger*, 338 Ark. at 419, 994 S.W.2d at 472-73. Second, to say that "northeast Arkansas" is coextensive with Surgical Technologies's trade area is

not accurate.  Massa and Surgical Technologies have admitted that Surgical Technologies did not conduct business throughout northeast Arkansas.  Finally, even if the geographic restriction had been defined as "northeast Arkansas," there would be no way of knowing exactly what geographic areas are and are not encompassed by the adjective "northeast."

Surgical Technologies also cites *All-State Supply, Inc. v. Fisher*, 252 Ark. 962, 483 S.W.2d 210 (1972).  *Fisher* is not on point.  There, the noncompetition agreement restricted the employee from engaging in competitive business dealings in Arkansas for a period of two years after termination.  It was undisputed that the employer conducted business statewide, and that the former employee was covering three-fourths of the state with merchandise of a competitor, so the Arkansas Supreme Court held that the statewide geographic restriction was reasonable.  *Fisher*, 252 Ark. at 965, 483 S.W.2d at 212.

In *Jaraki*, the Arkansas Court of Appeals held that a noncompetition agreement that prohibited a cardiologist from practicing within 75 miles of Jonesboro, Arkansas, was overly broad because it included part of Memphis, Tennessee, which was not part of the employer's trade area. *Jaraki*, 75 Ark. App. at 207, 55 S.W.3d at 804.  Here, it is undisputed that Surgical Technologies does not conduct business in two of the five counties listed in the geographic restriction of Hall's noncompetition agreement, much less throughout the entire state of Arkansas.  It is undisputed that Surgical Technologies has no business interest to protect in two of the five counties specifically named as the geographic restriction in Hall's noncompetition agreement.  Therefore, the geographic restriction is overly broad, and Hall's noncompetition agreement with Surgical Technologies is unenforceable.

2.      *Darr's Noncompetition Agreement with Wright Medical*

As part of his employment with Wright Medical, Darr executed various agreements containing noncompetition clauses from 2002-2008. The agreement executed on February 14, 2002, contains a choice-of-law provision stating that Delaware law governs, and is titled a "Sales Representative Award Agreement." The noncompetition clause states:

> With respect to any State in which the Company is engaged in business during the period for which the Participant is engaged to provide Service and, for the one year period following such period of Service, with respect to the territory of the Participant's Service . . ., the Participant shall not participate or engage, directly or indirectly, for himself or on behalf of or in conjunction with any person, partnership, corporation or other entity, shareholder, partner, joint venturer, investor or otherwise, in any business activities if such activity consists of any activity undertaken or expressly contemplated to be undertaken by the Company or by the Participant at any time during the period of the Participant's Service.

The 2002 agreement contains an integration clause, which states: "This Agreement, together with the Plan, contains the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto."

The agreements executed from 2003-2006[4] are substantially the same for purposes of this dispute. All of those agreements choose Tennessee law. The noncompetition clauses restrict Darr from competing with Wright Medical within the territory of Darr's service while working for Wright Medical. The noncompetition clauses contain a sub-paragraph that states:

> In addition to all other legal and equitable remedies available to it, the Company shall have the right, and not the obligation, to cancel any or all of the Participant's Options if the Committee elects to take such action, *in its absolute discretion*, on the basis of the Committee's determination that the Participant has violated the covenants set forth in this Agreement.

---

[4] The agreements were executed on February 6, 2003; March 9, 2004; February 22, 2005; and March 21, 2006. Like the 2002 agreement, each of the 2003-2006 agreements is titled "Sales Representative Award Agreement."

(emphasis added).  The 2003-2006 agreements then contain an integration clause that states:

> This Agreement, together with the Plan, contains the entire agreement and understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto.  This Agreement, and this integration clause, is not intended to, and does not, limit or alter in any manner, the parties' obligations under any previous agreement concerning obligations to maintain confidentiality or with respect to restrictive covenants. . . .

The 2007 and 2008[5] agreements are also substantially the same for purposes of this dispute, and each is titled "Restricted Stock Grant Agreement."  The noncompetition clause, contained in paragraph 3.3(a), states:

> By accepting the Shares, Grantee represents and agrees for himself and his transferees . . . that [f]or the period commencing on the Grant Date and ending on the first anniversary of the termination of Grantee's service . . . with respect to any geographic territories in which the Company is engaged in business during the period for which Grantee provided service to the Company, Grantee shall not participate or engage, directly or indirectly, for himself or on behalf of or in conjunction with any person, partnership, corporation or other entity, whether as an employee, agent, officer, director, stockholder, partner, joint venturer, investor or otherwise, . . . in the distribution, solicitation, promotion, manufacture, design, development, or sale of any medical products or services competitive with products manufactured, marketed, or sold by the Company or any of its subsidiaries or any medical products or services intended to be manufactured, marketed, or sold by the Company of the same general type or function.

The 2007-2008 agreements do not contain a choice-of-law provision.  The final line, under a section titled "Miscellaneous," states: "This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof."

In summary, the 2002 agreement included an integration clause that had no exceptions.  The 2003-2006 agreements contained an integration clause that stated that the agreement superseded all previous agreements but that excepted from that supersession any prior noncompetition agreements.

---

[5] The agreements were executed on February 12, 2007, and March 4, 2008.

Finally, Wright Medical's 2007-2008 agreements returned to an integration clause containing no exceptions.  However, the 2007-2008 integration clauses and noncompetition agreements are part of a contract titled a "Restricted Stock Grant Agreement," rather than a "Sales Representative Award Agreement."

As the Court stated at the preliminary injunction hearing, the integration clause in the 2007-2008 restricted stock grant agreements—"This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof"—is ambiguous.  It is unclear whether the clause means that this constitutes the entire agreement with respect to the covenant not to compete, the entire agreement with respect to the stock agreement, or the entire agreement with respect to Darr's relationship with Wright Medical.

If the Restricted Stock Grant Agreement was drafted entirely by Wright Medical and sent to Darr for his signature, so that Darr had no input in the drafting of the agreement, then that ambiguity should be read against Wright Medical.  *See Elcare, Inc. v. Gocio*, 267 Ark. 605, 608, 593 S.W.2d 159, 161 (1980) ("[W]hen there is uncertainty or ambiguity in a contract or contracts and they are susceptible to more than one reasonable construction, then [courts] must construe them most strongly against the party who drafted them. . . ."); *First Nat'l Bank of Izard County v. Garner*, 86 Ark. App. 213, 219, 167 S.W.3d 664, 668 (2004).  However, if Darr had some input in drafting the language of the Restricted Stock Grant Agreement, then parol evidence might be admissible to explain the parties' intent and the meaning of the contract becomes a question of fact.  *See Minerva Enterprises, Inc. v. Bituminous Cas. Corp.*, 312 Ark. 128, 134, 851 S.W.2d 403, 406 (1993) ("The initial determination of the existence of an ambiguity rests with the court, and if ambiguity exists, then parol evidence is admissible and the meaning of the ambiguous terms becomes a question of fact for

12

the fact finder."); *Floyd v. Otter Creek Homeowners Ass'n*, 23 Ark. App. 31, 35, 742 S.W.2d 120,

123 (1988).

Darr has submitted an affidavit in which he states that he did not negotiate the terms or

provide any input into the drafting of the Restricted Stock Grant Agreements.  Wright argues,

however, that it has not had the opportunity to depose Darr, and that testimony of Wright Medical

officers and employees (other than the representative who testified at the preliminary injunction

hearing) is needed.  That argument ignores the fact that Wright Medical does not need to depose its

own officers and employees to obtain testimony to dispute Darr's affidavit on this point.  The

documents in issue are Wright Medical's documents.  For Wright Medical to determine who drafted

these documents discovery will not be required, only an internal inquiry directed to Wright Medical's

officers and employees.  Wright Medical has had ample time to obtain affidavits from its own

officers and employees—discovery is not needed for that purpose.  Rule 56(f) provides that if a party

opposing a motion for summary judgment shows by affidavit that, for specified reasons, it cannot

present facts essential to justify its opposition, the Court may deny the motion or grant a continuance.

Here, Wright Medical has presented no such affidavit.  Wright Medical has offered no specific

reason, by affidavit or otherwise, why it cannot provide evidence of who drafted its own documents.

If the evidence was exclusively in Darr's control, the Court might take a different view; but the

evidence is in Wright Medical's control.

The last agreement signed by Darr states, "This agreement contains the entire agreement of

the parties with respect to the subject matter hereof."  Construing any ambiguity against Wright

Medical, the noncompetition clause in that agreement supersedes all prior noncompetition clauses

in agreements signed by Darr.  The geographic restriction in that noncompetition clause extends to

"any geographic territories in which [Wright Medical] is engaged in business during the period for which [Darr] provided service to the company."  As noted above, Wright Medical engages in business on a global basis.  Darr's affidavit, which is undisputed, establishes that the agreement was mailed to him in Arkansas, and he signed it in Arkansas.  In the absence of a choice-of-law provision, the agreement is governed by Arkansas law.  *Tri-State Equipment Co. v. Tedder*, 272 Ark. 408, 614 S.W.2d 938 (1981).  As noted, the noncompetition clause in this agreement has no geographical restriction—it applies anywhere in the world.  Therefore, the noncompetition clause is unenforceable.  *HRR Arkansas, Inc.*, 350 Ark. at 431, 87 S.W.3d at 239.

## CONCLUSION

For the foregoing reasons, Darr's and Hall's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART.  Document #37.  Hall's motion for partial summary judgment regarding the validity of his noncompetition agreement with Surgical Technologies is GRANTED.  Hall's motion for partial summary judgment as to all of Surgical Technologies's claims, premised on the argument as to Surgical Technologies's legal status, is DENIED.  Darr's motion for partial summary judgment as to the validity of his noncompetition agreements with Wright Medical is GRANTED.

IT IS SO ORDERED this 6th day of August, 2010.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE